IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Terry Lee Spencer                    :

    Plaintiff                     : Case No. 3:16-CV-628

    v.                            : (Judge Richard P. Conaboy)

Nancy A. Berryhill, Acting           :
Commissioner of Social Security
Social Security Administration       :
U.S. Dept. of Health & Human Svcs.
                                  :
    Defendant

_____

**Memorandum**

**I.   Procedural background.**

We consider here Plaintiff's appeal from an adverse decision of the Social Security Administration ("SSA") or ("Agency").  The Agency initially denied Plaintiff's application for Disability Insurance Benefits ("DIB") and Widow's Insurance Benefits ("WIB") on May 8, 2014 whereupon Plaintiff requested a hearing before the Administrative Law Judge ("ALJ").  The Plaintiff ultimately received two hearings, an initial hearing on February 11, 2015 and a supplemental hearing on April 27, 2015.  The ALJ issued a decision denying Plaintiff benefits of any kind on April 30, 2015.  The ALJ's decision was then affirmed by the Appeals Council by Notice of Action dated February 22, 2016.  That Notice of Action constitutes a final decision of the Agency that vests this Court with jurisdiction over Plaintiff's appeal pursuant to 42 U.S.C. § 405(g).

## II.   Testimony before the ALJ.

### A.   Hearing of February 11, 2015.

Plaintiff's testimony may be summarized as follows.  She was born on June 25, 1956 and was 58 years of age on the date of the hearing.  She had been married but was widowed about one year before the hearing.  She had been married for nine years.  (R.77-78).

Plaintiff alleged that she became disabled as of September 20, 2011.  On that date she was in an automobile accident.  She did not go to the hospital on the date of the accident.  As the days passed, however, she grew progressively stiffer, had difficulty walking, and began to lose function in her right arm and hand.  (R.78-79).

Plaintiff was employed at the time of her accident.  She had been with her employer for more than five years at the time of her injury.  At the time she stopped working she had cut her schedule from 60 to 70 hours per week to 20 hours per week due to pain and an inability to work.  Her employer wanted her to remain on the job but she quit because of pain and an inability to sit for extended periods.  Her place of employment had neither provided for short or long term disability benefits nor provided medical coverage.  (R.79-80).

Plaintiff stated that she was right-handed, 5'4" tall, and weighed 165 pounds.  From her disability onset date until the date

2

of her husband's death she lived on her husband's paycheck.  She was not covered by health insurance by her husband's employer.  She received $108.01 each month from an annuity and, until August of 2014, was getting $1,000.00 per month from State Farm Insurance Company on an income insurance plan she had purchased while she was working.  At the time of the hearing, the Plaintiff's only income was from the aforementioned annuity and assistance from family and friends.  She also receives food stamps and has obtained a medical assistance card.  She obtained the medical assistance card in October of 2013.  (R.80-82).

Plaintiff is a licensed driver.  She completed high school and completed three college level courses afterward.  She is fluent in written and spoken English and has good arithmetic skills.  She has never been in the military nor has she ever been incarcerated. (R.83-84).

Plaintiff's primary work had been as a secretary.  She worked in a law office and for a heating and air conditioning company. Plaintiff characterized herself as a self-employed independent contractor.  She personally did all the record keeping for her business and prepared her own tax returns.  (R.85-86).

In her secretarial work Plaintiff normally lifted no more than 10-15 pounds but occasionally would lift up to 40 pounds in her estimation.  At the time of her hearing, Plaintiff was still working on a very limited basis.  (R.87-89).

3

With regard to her mental health, Plaintiff stated that she had not undergone any inpatient hospitalization for mental health at any time since her alleged onset date, September 20, 2011.  She also acknowledged that she had not participated in any intensive outpatient therapy, individual therapy, group therapy, or taken any medications prescribed by a mental health professional since her onset date.  She did testify that her family doctor had prescribed "medications for mental health" for approximately four years – – a period starting some six months before her onset date.  Plaintiff described her mental health problems as "a lot of stress, hives off and on, anxiety, and nervousness."  She is frequently irritated, angry, and frustrated.  Her family doctor has prescribed Wellbutrin to help her with her anxiety but has not otherwise discussed additional treatment that might help her to address her mental health problems.  (R.89-91).

With regard to her spinal problems, Plaintiff stated that she had not undergone any form of spinal surgery or inpatient hospitalization since her onset date.  She has, however, received three spinal injections in 2012.  Plaintiff explained that the first two injections helped her to some extent but that the third injection did not help her much.  She also stated that shortly after she had the third injection her medical coverage expired. She acknowledged that she saw an orthopedic physician at about the same time she received the injections and that he noted her lower

back pain was markedly improved.  She stated that the orthopedic specialist told her at their last session that she should come back to see him "when the pain got so bad I was crawling."  At no time after she received her medical card in 2013 did she return to see the orthopedic physician nor did she see another orthopedic physician.  (R.91-94).

Plaintiff did undergo a regimen of physical therapy at the "Hetrick Center".  The program had lasted for two months but according to Plaintiff participation in the program actually made her condition worse.  At some point, Plaintiff began to see a chiropractor three times each week.  When her medical benefits under her auto policy were exhausted, she continued to treat with the chiropractor.  The chiropractor is anticipating payment when she settles a claim she has filed against the insurance company of the man whose vehicle struck her.  Plaintiff has given a deposition in that case and has undergone an independent medical examination with a "Dr. Mitrick".  Before closing the record the ALJ requested that she be supplied with the deposition transcript and the independent medical examination report before Plaintiff's next hearing.  (R.95-100).

**B.  Hearing of April 27, 2015.**

Plaintiff's reconvened hearing included further testimony by her and testimony from Brian Bierley, a Vocational Expert ("VE").  Plaintiff's testimony resumed with questioning regarding her carpal

tunnel syndrome.  She stated that her hands go numb often and it is sometimes painful.  She indicated that she has had no treatment specifically for carpel tunnel syndrome but that her doctor has discussed the possibility of surgery with her.  She stated that she is still considering whether to have such surgery.

Plaintiff also stated that there had been no change in her back symptomology.  She stated that she had had no surgery or additional trigger point injections since her first hearing some ten weeks earlier.  She also denied having any physical therapy or inpatient hospitalizations in the interim.  She stated that she had, however, continued treating with her chiropractor and family doctor.  Her medications keep her pain somewhat under control but don't work as well at present as they did in 2011.  When asked why she had discontinued physical therapy Plaintiff reiterated that she stopped going for physical therapy because it aggravated her symptoms.  (R.40-46).

Plaintiff testified further that in 2012 her typical day consisted of the following: rise between 7 and 8 a.m.; "make coffee and wait for everything to start loosening up...so I would be functional"; shower, dress and drive to work; in the time between getting dressed and leaving for work she would have her breakfast, feed her cats, and let her dogs out; on her drive to work she would stop at a corner store and buy a bottle of water; she would arrive at work around noon, work until 4:00 or 5:00 p.m., and leave for

6

home; on the way home she would stop at the grocery store where her husband worked to say hello for about 15 minutes; upon arriving home she would take a pain pill; later in the evening she would play games on the computer for 30-45 minutes and read for 2-3 hours before retiring for the evening at 11:00 or 11:30 p.m.. (R.47-51).

When asked what her typical day was like in the summer of 2014, Plaintiff stated that she would rise between 7:00 and 8:00 a.m. She would then make coffee and take her pain pill. After the pain pill would "kick in" she would have breakfast, get dressed and go to see Dr. Smith, her chiropractor, three days each week. Typically, she would leave for the chiropractor about 9:40 a.m. and return to her home about 11:30 a.m. Upon returning home she would take one half of a pain pill, have lunch, and then read for 2-3 hours. Afterward she would nap for the rest of the afternoon. In the evening she would watch television for 5-6 hours and retire around 11:30 p.m. (R.51-54).

Plaintiff stated that she has been disabled since September 20, 2011 because she is no longer "functional". She describes her pain as intolerable, says that her hands go numb, and says that she can neither type nor write well anymore. She stated further that the pain in her legs drives her insane and her back pain is so intense she feels like it is on fire. (R.54-55).

Plaintiff testified that she had not seen an orthopedic specialist or sought out any other specialist for her carpel tunnel

syndrome since September of 2013 when she obtained her medical assistance card.  She stated that she did not see experts because many of them don't accept the medical card.  She testified further that Dr. Endy is encouraging her to see a neurologist but that, on the date of her second hearing – some nineteen months after getting her medical card, she is still looking for a neurologist.  (R.55-56).  Upon questioning by her attorney, Plaintiff testified that she has lived alone since her husband died.  She reaffirmed that her last employment had been as a secretary.  Previously she had worked for Decker's Heating and Cooling as a secretary for about two years.  She stated that she had worked two jobs simultaneously for much of her life until 2010.  At about that time she began to experience pain in her low back for which she received a series of injections.  These injections would help for a time but the pain would always return.  After having three injections which were at least temporarily helpful she had no others because she had no insurance coverage and no means to pay for them.  She acknowledged that she has been in two auto accidents, one in 2011 and one in 2013, and that litigation is pending with respect to each.  (R.56-59).

Plaintiff estimated that she could stand or walk for about 10-15 minutes before she begins to feel pressure in the small of the back which soon becomes pain that radiates down into her right leg. After a while her feet become numb.  When she walks she feels

unstable and lists to her left side.  She can sit in place for 20-30 minutes before she becomes uncomfortable.  She stated that she sleeps best when she uses sleeping medications, but she tries not to use them anymore than necessary.  When she doesn't take the sleeping medications she doesn't sleep at all.  She feels tired during the day whether she uses the sleep medications or not.  Her most comfortable position is supine with her right leg propped up on a pillow.  (R.60-62).

Brian Bierley, a vocational expert, also testified.  He indicated that he had reviewed Plaintiff's file regarding her work history and had listened to her testimony.  He stated that he was familiar with the statutes and regulations regarding vocational considerations and that he would explain any statement he made that did not conform to the Dictionary of Occupational Titles ("DOT"). Mr. Bierley stated that Plaintiff was of "advanced age" with a high school education.  He explained that Plaintiff's past work was secretarial in nature and that it would be classified as sedentary/skilled.  This occupation requires frequent reaching forward, handling and fingering.  The "acquired skills" essential to secretarial work would include operating a keyboard, general office-type activities, maintaining files, and dealing with the public.  (R.62-63).

Mr. Bierley also stated that Plaintiff's work history included bartending.  Bartending is "light" work as described but "medium"

work as performed.  Bartending is considered semi-skilled employment.  Frequent reaching in all directions, handling, customer contact and working a cash register are essential tasks of a bartender.  (R.63-65).

The ALJ asked the VE a hypothetical question in which he was asked to assume someone the same age and education as the Plaintiff with similar work experiences.  The VE was asked to further assume a person who was capable of "light work" and who could work an eight-hour day taking only "normal breaks"; who had further limitations such that climbing ramps or stairs could be done only occasionally; who could not climb ropes, ladders or scaffolds; who could stoop, kneel, crouch and squat only occasionally, could reach overhead with the right arm only occasionally, and could not repetitively handle and finger with her right hand.  The hypothetical question also assumed only occasional exposure to extreme cold and never exposure to large vibrating objects or hazardous machinery.  Assuming these limitations, the VE stated that the hypothetical person would be capable of performing the duties of a secretary as actually and customarily performed.  The VE also stated that a person with the limitations described in the ALJ's hypothetical question would also be capable of performing as a receptionist.  Finally, the VE stated that the hypothetical person would be capable of performing such light, unskilled jobs as conveyor line baker worker, laminating machine tender, and

10

furniture rental consultant.  Each of the jobs identified by the VE exists in significant numbers in the national economy.  (R.66-70).

## III.  Medical Evidence.

### A.    Dr. Deanne Endy.

Dr. Endy treated Plaintiff as her primary care physician for more than ten years prior to the date of the ALJ's decision.  Dr. Endy testified that her treatment of Plaintiff preceded and continued throughout the time she had both auto accidents alluded to above.  On October 28, 2011, approximately one month after Plaintiff's onset date, Plaintiff's MRI revealed multi-level degenerative discs and slight bulges at C4-C5, C5-C6, and C6-C7. At that time, Plaintiff's main complaints were neck pain, lateral upper arm pain with decreased mobility, low back pain, and a problem with her hands falling asleep.  As early as November of 2013, Plaintiff's MRI demonstrated severe facet hypertrophy and left neural foraminal stenosis at C4-C5.  (R.741-742).

On March 6, 2015, Plaintiff had an MRI of her lumbar spine which showed degeneration and spondylosis at L4-L5 along with central canal bilateral foraminal stenosis.  (R.743).  One month earlier (in February of 2015) x-rays of Plaintiff's lumbar region revealed a moderate L4-L5 disc narrowing and subluxation consistent with a Grade 1 spondylolisthesis which the reader interpreted to be a "progression" compared to unidentified previous studies.  Dr. Endy stated that Plaintiff's complaints and symptomology were

11

consistent with the MRI and x-ray studies.  Dr. Endy also noted that Plaintiff was experiencing, as of April 16, 2015, "ongoing increased pain levels, which have become unbearable, in the left neck into the posterior shoulder and lateral shoulder consistent with C4-C5 left-sided neuro-foraminal stenosis".  (R.744-745).  Dr. Endy also noted urine and bowel urgency severe enough that Plaintiff now wears a pad.  These symptoms could be expected to result from Plaintiff's spinal stenosis according to Dr. Endy. (R.746).

Dr. Endy also stated that she has prescribed Percoset 10/325 six times daily for Plaintiff's pain.  She described this dose as "moderate".  Plaintiff was also prescribed Neurontin to combat neck spasms without complete relief.  (R.763).  Dr. Endy stated that she has no doubt that Plaintiff's symptoms are genuine and that she is experiencing severe neck pain and low back pain.  (R.764).

Dr. Endy also testified that EMG studies revealed that Plaintiff is experiencing mild bilateral carpal tunnel syndrome as of January of 2015.  (R.765).  Dr. Endy related that Plaintiff's low back and carpel tunnel symptoms were both present immediately after her first accident in 2011 and grew worse after her second accident in 2013.  (R.766).  Dr. Endy opined that by the time of Plaintiff's second accident in June of 2013, Plaintiff has been unable to perform a full day's work due to her neck and low back pain, inability to sit for long periods, and difficulty typing.

12

Dr. Endy stated that Plaintiff's difficulty sleeping also impairs her ability to work.  Dr. Endy concluded that Plaintiff needs a surgical intervention to alleviate her pain to the point that she can perhaps work again at some point.  (R.770-771).

**B. Dr. Raymond Dahl.**

In May of 2012, approximately eight months after her alleged onset date, Plaintiff presented to Dr. Dahl, an orthopedic specialist.  Dr. Dahl saw Plaintiff on referral from Dr. Endy.  Dr. Dahl noted lumbar pain and a mildly positive straight leg-raising test.  He also found that Plaintiff exhibited normal gait and reflexes along with good motor function in all extremities.  Dr. Dahl ordered a cervical spine MRI that showed disc disease and stenosis at C5-C6 and C6-C7 and a lumbar spine MRI that revealed stenosis at L3-L4 and L4-L5.  (R.350-51).

Dr. Dahl then referred Plaintiff to a pain management specialist who administered three lumbar steroidal injections in May and June of 2012.  At a July 2012 follow-up appointment with Dr. Dahl, Plaintiff reported that these injections were helpful. Dr. Dahl's physical examination of Plaintiff at this time was essentially unchanged but for the fact that Plaintiff's straight leg-raising test was negative.  Dr. Dahl's recommendation in July of 2012 was for no further treatment.  (R.349).

**C.   Dr. Hua Yang.**

Dr. Yang performed a consultative internal medical examination

13

of Plaintiff for the Board of Disability Determination on May 1, 2014 (some 31 months after Plaintiff's alleged disability onset date).  Dr. Yang reported that Plaintiff's chief complaints were neck and low back pain.  Plaintiff's subjective complaints to Dr. Yang closely mirrored those she had made to Drs. Endy and Dahl. (R.644).

Dr. Yang noted that Plaintiff appeared to be in no acute distress and that her gait was normal.  She was able to heel and toe walk without difficulty and could perform a full squat.  She was able to rise from the chair and get on and off the examination table without difficulty.  Her stance was normal and she used no assistive devices.  (R.645).

Plaintiff did not exhibit any scoliosis or other abnormality in her thoracic spine.  She did exhibit mildly decreased range of motion in her left shoulder.  She displayed no evidence of shoulder joint deformity.  Plaintiff displayed no sensory deficits in her arms or legs and demonstrated 5/5 strength in all extremities. With respect to mental status, Plaintiff did not manifest impaired judgement or significant memory impairment and her affect was normal.  (R.646).  Dr. Yang diagnosed lower back pain, neck pain, history of asthma, and history of migraine.  (R.647).

Dr. Yang also completed a Medical Source Statement of Ability to Do Work-Related Activities Form.  He found that Plaintiff could frequently lift up to 20 pounds with the left arm and continuously

14

lift up to 20 pounds with the right arm; frequently carry up to ten pounds with the left arm and continuously carry up to ten pounds with the right arm; sit six hours in an eight-hour workday; stand two hours in an eight-hour workday; walk two hours in an eight-hour workday; continuously use her right hand for all manipulative activities; frequently use her left hand for all types of reaching and continuously use her left hand for all other manipulative activities; continuously operate foot controls; never climb ladders or scaffolds; continuously climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl; occasionally be exposed to unprotected heights and moving mechanical parts; continuously operate a motor vehicle; and never be exposed to humidity and wetness, dust, odors, fumes, pulmonary irritants, or temperature extremes; excessive vibration, and very loud noise. (R.648-52).

## IV.   The ALJ Decision.

The ALJ's decision was unfavorable to the Plaintiff. (Doc. 5-2 at 18-35).  It included the following significant findings of fact and conclusions of law:

5.   The claimant has the following severe impairments: disorders of the spine and mild right-shoulder tendinitis.

6.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part

15

404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

7.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional climbing stairs and ramps and no climbing ropes, scaffolds, poles or ladders. The claimant can occasionally stoop, kneel, crouch/squat, and needs to avoid crawling on hands and knees.  The claimant can occasionally reach overhead with the right upper extremity.  The claimant can handle and finger with her right upper extremity, but not repetitively (without interruption within an eight-hour workday except for normal breaks) over an eight-hour workday.  The claimant can sustain occasional exposure to extreme cold.  Due to possible side effects from medication, must avoid working with or around hazardous machinery, in high exposed places, objects or surfaces, and around large objects or machinery or around large fast-moving machinery on the ground.

8.  The claimant is capable of performing past relevant work as a secretary.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

16

### V.    Disability Determination Process.

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fourth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.29-30).

## VI. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make

18

clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

    This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not

sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the

court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.")).  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**VII. Discussion.**

**A. General Considerations**

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here,

we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.   Plaintiff's Allegations of Error.**

Plaintiff alleges that the ALJ's analysis contains numerous errors requiring a remand of this case. We shall consider these in turn.

**1.   Whether the ALJ Erred by Failing to Find that Plaintiff Met the Criteria in the Agency's Listing 1.04A?**

22

Listing 1.04A states:

1.04A.  Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord with:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)....

Plaintiff asserts that she meets the requirements of listing 1.04A and, thus, should be awarded DIB benefits.  Plaintiff's counsel states that Dr. Endy "...opined, with specific reference to test results, that Spencer has herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease and facet arthritis.  She further opined that those conditions result in compromise of a nerve root, including the spinal cord.  Finally, Dr. Endy stated that there is evidence of nerve root compression, limitation of motion of the spine, motor loss and a positive straight leg-raising test.  As a result, there

is uncontradicted medical evidence, from Spencer's treating physician, that she meets the criteria of 1.04A.  (Doc 6 at 5).

The Government disagrees and notes that a claimant seeking to obtain benefits under a Listing must meet all the requirements of that Listing and that meeting some of the criteria, no matter how severe the symptoms may be, does not entitle a claimant to benefits.  (Doc. 11 at 17) citing Sullivan v. Zebley, 493 U.S. 521, 532 (1990)).  The Government also establishes by reference to the record that Dr. Endy's testimony is not, as Plaintiff alleges, uncontradicted.

Our review of the portions of the record cited by the parties persuades the Court that the ALJ had a reasonable basis for concluding that Plaintiff did not satisfy <u>all</u> criteria of Listing 1.04A.  The Government notes that two lumbar spine MRI's, one in May of 2012 and another in March of 2015, do not support Dr. Endy's characterization of the objective medical testing.  The physicians who read the MRI's in question did not identify any herniated discs or compromised or compressed nerve root involvement at any level. Testing indicates that Plaintiff does suffer from arthritis, stenosis, and degenerative disc disease, but that very same testing does not support the proposition that Plaintiff displays "evidence of nerve root compression", the sine qua non for an award of benefits under Listing 1.04A.  Accordingly, Plaintiff's allegation of error on this point must be rejected.

24

**B.     Whether the ALJ Gave Appropriate Weight to Dr. Endy's Medical Opinion?**

Plaintiff argues that the ALJ's decision to give "limited weight" to the opinion of Dr. Endy, a treating physician, was inappropriate and error justifying a remand of this case. Certainly, the opinion of a long-time treating physician like Dr. Endy is normally entitled to great weight and can be rejected only on the basis of contradictory medical evidence.  Frankenfield v. Bowen, 861 F.2d 405 (3d. Cir. 1998).  However, Plaintiff's argument is unpersuasive because the ALJ's assessment of Dr. Endy's opinion is not, as Plaintiff asserts, uncontradicted by the opinions of any other physician.  (Doc. 6 at 7).

As alluded to at page 24 above, MRI and x-ray reports of record that were interpreted by other physicians did not support Dr. Endy's dire view of the Plaintiff's physical condition. Significantly, Dr. Yang's report and his functional capacity evaluation of the Plaintiff were supportive of the ALJ's RFC finding.  Dr. Yang's evaluation certainly provides a reasonable medical basis for the ALJ's conclusion that Plaintiff can perform "light work" as further modified by numerous additional restrictions in her RFC finding.  (R.at 25-26).  For this reason, we must reject Plaintiff's argument that Dr. Endy's report was improperly subordinated to that of Dr. Yang.

25

C.    **Whether the ALJ Erred by Improperly Evaluating Plaintiff's Mental Impairments and Thus Compromised Her RFC Determination?**

Plaintiff contends that her 2011 diagnosis of anxiety and Dr. Endy's assessment that she was "markedly limited" in her ability to maintain concentration, persistence, and pace as of January 19, 2015 was not adequately considered by the ALJ in determining her RFC.  Plaintiff contends specifically that the AlJ failed to follow the Agency's own procedures in this regard as set forth at 20 CFR 404.1520(a).  (Doc. 6 at 8-9).  That procedure requires the Agency to rate the degree of limitation, inter alia, of the Plaintiff's ability to maintain concentration, persistence and pace.  See 20 CFR 40.1520(b)(4).

Defendant points out that to be considered severe Plaintiff's impairment must significantly limit her ability to carry out basic work activities.  Defendant notes further that Dr. Yang observed Plaintiff to be oriented to all spheres, not delusional, exhibiting normal affect, and displaying no signs of impaired judgment or significantly impaired memory.  (Doc. 11 at 24, citing R.646).  Defendant also calls attention to the report of a state agency evaluator, Dr. Ondis, who reviewed Plaintiff's treatment records in May of 2014 and concluded that Plaintiff did not have any medically determinable mental impairment.  (Doc. 11 at 25, citing R.114).

The ALJ specifically found (R.24) that there was no support in

26

the record that Plaintiff's non-severe anxiety and depression resulted "in more than a minimal degree of limitation in the ability to perform basic work tasks."  Having reviewed the portions of the record cited by the parties, the Court determines that, given the extremely conservative treatment that Dr. Endy afforded Plaintiff for her anxiety and the absence of any indication that Plaintiff was ever referred to a mental health specialist for that condition, the ALJ's finding in this regard is not patently unreasonable.  Still, the ALJ's failure to include some mention of Plaintiff's difficulty with concentration, persistence, and pace in her hypothetical question to the vocational expert (after acknowledging the existence of some difficulty) is problematic.  An ALJ's hypothetical question must include <u>all</u> of a claimant's impairments both severe and non-severe.  Ramirez v. Barnhart, 372 F.3d 546, 552 (3d. Cir. 2004); See also Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d. Cir. 1987).  Consequently, this case must be remanded for further refinement of the Plaintiff's RFC in light of all her impairments be they severe or non-severe.

**D.   Whether the ALJ's Conclusion that the Plaintiff's Complaints Exaggerated the Level and Intensity of Her Pain was Adequately Explained?**

Plaintiff asserts that the ALJ's rationale for finding that her medically determinable impairments do not cause pain as intense, persistent, and limiting as alleged was inadequate.  The

ALJ provided her reasons for this conclusion including: (1) MRI's of Plaintiff's lumbar and cervical spine revealed only mild narrowing at L4-L5 and moderate stenosis at C4-C5; (2) various medical reports indicated that Plaintiff had normal posture and gait, good sensation bilaterally in all extremities, that she presented in no acute distress at various times, and that she displayed 5/5 strength in all extremities on examination in May of 2014 - - some 31 months after her alleged onset date; and (3) plaintiff has, apart from chiropractic treatments that have afforded her some relief, received very conservative and limited treatment since her alleged onset date more than five years ago. (R.at 26-28).

Having read the ALJ's decision and scrutinized the record, we conclude that the ALJ's reservations about the level and persistence of Plaintiff's pain are reasonably explained in her decision.  The Court finds it particularly significant that Plaintiff has not seen a specialist since her sessions with a pain management specialist in the summer of 2012.  This is even more significant given Dr. Raymond Dahl's assessment in July of 2012 that epidural injections Plaintiff had received resulted in marked improvement in her condition.  (R.349-351).  Plaintiff's election to treat in such a conservative manner may certainly be regarded as probative that her symptoms may not be as severe as she contends. Mason v. Shalala, 994 F.2d 1058, 1068 (3d. Cir. 1993).

Accordingly, we find that the ALJ's rationale for not fully crediting Plaintiff's complaints as to the level, persistence, and limitations of her pain was supported by the requisite substantial evidence.

**E.      Whether the Opinion Testimony of the Vocational Expert was Flawed Because it Was Given in Response to an Incomplete Hypothetical Question?**

The Court has already concluded that the ALJ's failure to include mention of Plaintiff's difficulty with concentration, persistence, and pace was inappropriate in our discussion of Subsection C above.

**VIII.      Conclusion.**

For the reasons discussed in this Memorandum, this case will be remanded to the Commissioner for further proceedings to establish Plaintiff's appropriate residual functional capacity and to allow expert vocational testimony on whether she retains the capacity to maintain employment.

<u>S/Richard P. Conaboy</u>
Honorable Richard P. Conaboy
United States District Court

Dated: March 9, 2017